UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------x

In re                                                    Chapter 11

      1934 Bedford, LLC,                                 Case no.  19-44751

                Debtor.

--------------------------------------------------------x

## OBJECTION TO DEBTOR'S USE OF CASH COLLATERAL

      1930 Bedford Avenue LLC ("Mortgagee"), the holder of first mortgages on the

property owned by 1934 Bedford, LLC (the "Debtor") at 1930-1934 Bedford Avenue, Brooklyn,

New York (the "Property"), as and for its objection to the Debtor's motion for cash collateral

use, collect rents and operate the Property, respectfully represents as follows:

    **(a) The motion's condemnation of the Mortgagee's Principals' religious observance is a
sanctionable ploy to distract attention from Debtor's principal's cash collateral
conversion, his refusal to negotiate cash collateral terms, and his disregard for the
law and orders of this Court,**

    **(b) Bankruptcy Courts routinely sanction those responsible for unauthorized cash
collateral use, and**

    **(c) Since the Debtor cannot be trusted with the Property's rental income, the
Mortgagee suggests competent, affordable disinterested third-party property
management.**

## BACKGROUND

      1.      On August 2, 2019, an involuntary petition was filed against the Debtor

under section 303 of the Title 11 of the United States Code, 11 U.S.C. "101 et seq. (the

"Bankruptcy Code") by Simply Brooklyn Realty asserting an $18,000 claim, HTC Construction

Management, Inc. asserting a $100,000 claim, and HTC Plumbing, Inc. asserting a $25,000

claim (the "Petitioners").

2.    The Debtor owns the real property located at 1930-1934 Bedford Avenue, Brooklyn, New York (the "Property") pictured below:



3.    The Property is a seven-story and cellar, elevator, mixed use rental building containing community facilities in the cellar, first and second floors, thirty-eight (38) apartments on the upper floors, and a 19-car parking garage. The gross building area is 59,212 square feet and the net rentable area is 50,187 square feet.  When fully leased, the rent roll indicates aggregate rents of $2,436,744 per year, or more than $200,000 per month.

4.      According to the cover letter to an appraisal the Debtor has not produced, the Property value is $38,600,000.

5.      The Mortgagee holds first mortgages in the principal amount of $15,000,000.  As set forth in Mortgagee's September 19, 2019 proof of claim, the total amount due as of September 12, 2019 is $18,809,274.  Per diem 24% interest accrues at $10,000 per day. The Mortgagee's June 3, 2019 foreclosure complaint ("Foreclosure Complaint"), a copy of which is annexed to the Proof of Claim, identified additional secured claims of record against the Property totaling about $1,686,812.  Secured claims thus total approximately $20,377,000.  The Debtor's schedules disclose unsecured claims totaling $8,641,000, $8,500,000 is claimed by Nikol Von Lavrinoff, the Debtor's principal.

6.      Besides the Property, the only other assets identified as having value are $24,655 of cash on hand on the petition date and machinery and equipment valued at $65,000.

7.      The $1,686,812 secured lien filed against the Property on about August 29, 2018 was an event of default under the Mortgages.  The Maturity Date in each note ("Notes") annexed to the Proof of Claim is February 28, 2019.

8.      The Mortgagee commenced its Foreclosure Action on June 3, 2019 and promptly sought the appointment of a receiver.

9.      By order dated June 11, 2019 (the "Receiver Order,"), the Supreme Court appointed the Receiver to take possession of the Property and the rental income.

10.      On June 23, 2019, the Debtor requested an emergency order to show cause for injunctive relief vacating the Receiver Order pending determination of the Debtor's motion to vacate.

11.     The Supreme Court denied the application for injunctive relief and set the matter down for a hearing on the merits.  The Debtor appealed both the Receiver Order and the denial of injunctive relief.  On June 27, 2019, the Appellate Division affirmed the Receiver Order.  On July 10, 2019, the Supreme Court denied the Debtor's order to show cause on the merits.

12.     Meanwhile, on June 17, 2019 the Debtor sued the Mortgagee in a special proceeding under RPL § 274-to compel the Mortgagee to retract is prior payoff letter and replace it with a payoff letter that did not include default interest and other charges.  The Debtor falsely argued that it had received oral default waivers, despite the loan documents prohibition on oral waivers to preclude such self-serving arguments.  The Debtor falsely argued further that the Mortgagee failed to give default notices, despite there being no obligation in the loan documents to give notice of unauthorized subordinate liens.

13.     On August 2, 2019, the Receiver filed his bond.  The same day, certain petitioners filed this bankruptcy as an involuntary case.

14.     According to the Schedules, after the Debtor stopped paying the Mortgagee, Mr. Lavrinoff and transferred $313,024 to himself, $88,024 allegedly for "Loan Repayment," and $225,000 for "Salary."

15.     At a hearing on September 12, 2019 on the Mortgagee's motion to permit the Receiver to take possession, it became clear that the involuntary filing was collusive so the Debtor could avoid filing a voluntary petition.  The Debtor consented to an order for relief and stated that it would try to reach a consensual agreement with the Mortgagee to use cash collateral to avoid the installation of the Receiver.

16.     The same day, the Mortgagee sent the Debtor terms for use of cash collateral.  The Debtor never responded to those terms.

17.     On October 7, 2019, the Debtor sent the Mortgagee a proposed cash collateral budget, a copy of which is annexed hereto as Exhibit A.  The Mortgagee responded by email dated October 10, 2019 (Exhibit B), objecting, absent documentation, to outsized $17,000 monthly payments to insiders for "salary" besides property management fees, large office fees for insiders, and other items that appeared inflated and for insiders.  The Debtor never responded.

18.     On November 3, 2019, the Debtor requested use of $2,400 of cash collateral for urgent repairs (Exhibit C).  The Mortgage responded that it would answer after the Debtor disclosed the balance in the DIP account.

19.     On November 20, 2019, the Debtor filed its October 2019 operating report (Exhibit D).  The report shows that the Debtor made unauthorized cash collateral expenditures totaling $19,091, $12,221 of which appears to have been disbursed to insiders for salaries and fees, as against only $77,788 of rental income.

20.     The last mortgage payment was in January.  Since that time, the Debtor has been collecting rent, but as of October 1, 2019, the Debtor had no money in the bank.  The Debtor refuses to account, despite this Court's direction at the last hearing.  Meanwhile interest is accruing a $300,000 per month.

(a) **The motion's condemnation of the Mortgagee's Principals' religious observance is a sanctionable ploy to distract attention from Debtor's principal's cash collateral conversion, his refusal to negotiate cash collateral terms, and his disregard for the law and orders of this Court**

21.     On November 25, 2019, the Debtor filed hundreds of pages of pleadings seeking use of cash collateral.

22.     In none of those hundreds of pages did the Debtor disclose the $300,000 paid to insiders before the involuntary petition, nor the $19,091 of unauthorized payments in October, nor whether those unauthorized payments continued into November, nor payments to insiders during the involuntary gap period.  Consistent with its prior practice, the Debtor's motion does not disclose how much money is in the DIP account.  To do so would red flag that the Debtor converted the November rental income.

23.     The motion discloses no specific emergency payments that must be paid forthwith or the consequences of failing to pay.  Since the Debtor appears to have been paying bills without authorization until now, it would be unusual for there to be a true emergency that could not wait the minimum 15-day minimum notice period, or that the Mortgagee would not agree to pay to avoid an emergency hearing during the shortened Thanksgiving week.

24.     To be clear, the Debtor did not contact the Mortgagee before making the emergency motion to inform the Mortgagee of any particular expenses that must be paid to avoid termination of essential services.  The Debtor's undifferentiated "Bills Outstanding Now" includes $11,680 for October "payroll," although according to the October operating statement, the Debtor already paid $6,640 for "payroll" in October without authorization.  The Debtor represents that the same amount is due for November, which suggests that the Debtor has already paid $6,640 in November as well.

25.     On the use of cash collateral generally, the Debtor did not disclose that it failed to respond to the Mortgagee's proposed cash collateral terms, failed to respond to the Mortgagees questions on the budget and failed to respond to the Mortgagee's question as to how much money the Debtor held in its DIP account so the Mortgagee could respond to the Debtor's request for emergency use.

26.     The Debtor's budget does not disclose how much of the payroll, management and "Misc." line items proposed to be paid are insider payments.  The budget does not disclose why the rental income for October, as reflected on the operating report, was about $78,000, but December rent is projected to be $120,000.

27.     The Debtor's budget does not disclose that it renders this Court's order that the Debtor pay contract rate interest not feasible.  Instead of proposing to use the rents solely to preserve and protect the property, the Debtor budgeted $80,757 for a reserve to be paid as commitment fees to potential lenders.

28.     The Debtor blithely assumes that any challenge to cash collateral use is frivolous due to the alleged existence of a "handsome" equity cushion.  The Mortgagee is not sure how handsome that cushion still is.  The Debtor did not attach the entire December 2018 appraisal upon which it relies, only the summary pages.  The Mortgagee suspects, however, that the appraisal was based on upon a potential $200,000 rent roll.  But the October operating report discloses only $78,000 of rental income.  Since the Debtor has not disclosed the contents of the appraisal, the Mortgagee cannot compare the expected expenses to the actual expenses.  It is unlikely that the appraisal has a line item for salary for the Debtor's principal. These items affect value.  Particularly with default interest accruing at $10,000 per day.

29.    In summary, the motion is silent on its disregard for the Debtor's illegal use of cash collateral since this case commenced, payments to insiders before and after this case commenced, the Debtor's failure to respond to the Mortgagee's attempts to negotiate cash collateral terms, the Debtor's failure to specify the nature of the emergency requiring an order to show cause, or even the Debtor's attempt to negate this Court's Order that the Debtor pay the Mortgagee interest commencing December 1, 2019.

30.    Instead of focusing on the rules governing use of cash collateral for a limited liability company in bankruptcy, the Debtor submitted a lengthy self-serving diatribe seeking sympathy based on its managing member's person family issues, his distorted perception of debt collection under Jewish law as opposed to New York law, and condemnation of Mortgagee's principals' Jewish religious observance.

31.    The Debtor's fixation on the religious beliefs of the Mortgagee's principals and members of their families (including stalkerish photographs) is improper and sanctionable harassment under Rule 9011.  Together with his conversion of the rents, his collusive involuntary filing, and his refusal to follow this Court's orders, the Debtor's principal is not trustworthy enough to operate the Property.

**(b)    Bankruptcy Courts routinely sanction those responsible for unauthorized cash collateral use**

32.    Section 363(a) of the Bankruptcy Code defines "cash collateral" as

[C]ash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which  the estate and an entity other than the estate have an interest and includes  the proceeds, products, offspring, rents, or profits of property and the fees, charges, accounts or other payments for the use or occupancy of rooms and other public facilities in hotels, motels , or other lodging properties subject to a security interest as provided in section 552(b)

of this title, whether existing before or after the commencement of a case under this title.

33.     The Debtor acknowledges that the Mortgagee has a first priority security interest in the Cash Collateral. The post-petition effect of that interest is governed by section 552(b) of the Bankruptcy Code, which states:

> Except as provided in sections 363, 506(c), 522, 544, 545, 547, and 548 of this title, if the debtor and an entity entered into a security agreement before the commencement of the case and if the security interest created by such security agreement extends to property of the debtor acquired before the commencement of the case and to proceeds, products, offspring or profits of such property, then such security interest extends to such proceeds, products, offspring, or profits by the estate after the commencement of the case to the extent provided in such security agreement and by applicable non-bankruptcy law, except to any extent that the court, after notice and a hearing and based on the equities of the case, orders otherwise.

34.     The Mortgagee's interest extends to the post-petition rent generated by such property under section 552(b)(2) of the Bankruptcy Code, which states, at its pertinent parts, that:

> . . . [I]f the debtor entered into a security agreement before the commencement of the case and if the security interest created by such security agreement extends to property of the debtor acquired before the commencement of the case and to amounts paid as rents of such property or the fees, charges, accounts, or other payments for the use or occupancy of rooms and other public facilities in hotels, motels , or other lodging properties, then such security interest extends to such rents and such fees, charges, accounts, or other payments acquired by the estate after the commencement of the case to the extent provided  in such security agreement, except to any extent that the court, after notice and a hearing and based on the equities of the case, orders otherwise.

35.     Accordingly, the Mortgagee possesses a valid lien over the Cash Collateral.

36.     Generally, a debtor in possession, after notice and a hearing, may use, sell or lease property of the estate. 11 U.S.C. § 363(b). However, under section 363(c)(2) of the

Bankruptcy Code, a debtor-in-possession may not use, sell, or lease cash collateral unless each entity that has an interest in such cash collateral consents, or the court, after notice and a hearing, authorizes such use, sale, or lease under that section.

37.    The Mortgagee has not consented to the Debtor's use of cash collateral except to pay Debtor's counsel a $20,000 retainer and insurance on November 26, 2019, nor has the court authorized any such use, except to make interest payment to the Mortgagee commencing December 1, 2019.

38.    But the October operating report discloses unauthorized cash collateral use for October, and the Debtor's application for emergency use of cash collateral suggests that such unauthorized use continues, including substantial amounts paid to insiders.  This improper conduct alone is grounds for denying any request for Cash Collateral use that Debtor may file. *See e.g., In re Williams*, 61 B.R. 567, 575 (Bankr. N.D. Tex. 1986).

39.    The Debtor should not be rewarded for violating the law. *Marathon Petroleum Co., LLC  v. Cohen (In re Delco Oil, Inc.)*, 599 F.3d 1255, 1257 (11th Cir. 2010) (holding unauthorized use of cash collateral violates section 363(c)(2) of the Bankruptcy Code and constitutes an avoidable transfer under section 549 of the Bankruptcy Code).

40.    As stated by the Court in *In re Four Seasons*, 263 B.R. 764, 768-769 (Bankr. E.D. Tex. 2001):

> The Bankruptcy Code could not be more explicit as to the duty imposed upon a debtor-in-possession to account for a creditor's cash collateral. A debtor-in-possession is absolutely prohibited from using cash collateral unless it obtains the consent of the affected secured creditor or an authorization from the bankruptcy court.  In the absence of such consent or authorization, a debtor-in-possession is under an absolute obligation to segregate and to account for all such cash collateral. These principles are not subject to dispute.  (citations omitted).

41.     Bankruptcy Courts, therefore, may impose sanctions for those responsible for unauthorized cash collateral use. *E.g., Midwest Properties No.  Two v. Big Hill Inv. Co.*, 93 B.R. 357, 362 (N.D. Tex. 1988); *In re AG Service Centers, L.C.,* 239 B.R. 545, 552 (Bankr. W.D. Mo. 1999).

42.     By way of contrast, a party with an interest in cash collateral is entitled to adequate protection of that interest under sections 361 and 363(e) of the Bankruptcy Code.

43.     The Debtor has refused to negotiate use of cash collateral and has refused to account for rents since it stopped paying the Mortgage in February.  The Debtor appears to have permitted its managing member to convert sizable amounts of cash collateral both before and during this case.  The Debtor's misconduct cannot be excused by ignorance.  At status conferences, the Court instructed the Debtor not to use cash collateral absent the Mortgagee's consent, and Debtor's counsel repeatedly reassured the Court that the Debtor would not.  Despite the Court's admonitions (and presumably counsel's repeated instructions) the Debtor refused to follow the rules.

44.     The Mortgagee is justifiably concerned that further Court orders will be ineffective.

**(c)     Since the Debtor cannot be trusted with the Property's rental income, the Mortgagee suggests competent, affordable disinterested third-party property management.**

45.     The Mortgagee respectfully suggests that to adequately protect the Property, management should be transferred to a competent affordable disinterested management company.  Assuming the Debtor is unwilling to consent to such relief, the Mortgagee's mortgages permit the Mortgagee to insist on it.

46.    Paragraph 21 of both the Mortgagee's $7,000,000 building mortgage and

the $8,000,000 land mortgage (Exhibits E and F respectively) each provide for an assignment of

leases of rents in subsection (a) and for the Mortgagee to take possession and operate the

Property under subsection (b).  Subsection (b) states in pertinent part as follows:

> In furtherance of the assignment provided in Paragraph 21 (a), Mortgagor hereby grants to Mortgagee the following rights and powers: (i) to enter upon and take possession of the Premises; (ii) to demand payment of and collect the rents and other amounts payable under Leases, and to demand and enforce performance of the terms, covenants and conditions of Leases, by legal proceedings or otherwise; (iii) to exercise all of Mortgagor's rights, interests and remedies in and under the Leases; (iv) to settle, adjust or compromise the rents and other amounts payable under the Leases, and to settle, adjust or compromise any legal proceeding brought to collect the rents and other amounts payable thereunder or to obtain performance thereof; (v) to prepare, file and sign Mortgagor's name on any proof of claim in bankruptcy, or similar document in a similar proceeding, against obligors of the Leases; (vi) to endorse the name of Mortgagor upon any payment or proceeds of the rents and other amounts payable under the Leases and to deposit the same to the account of Mortgagee; (ii) to hold, manage, lease and operate the Mortgaged Property as Mortgagee may deem proper; (viii) to make necessary capital expenditures; (ix) to apply such rents, income and profits to the payment of all charges and expenses of operating the Premises, fees, disbursements and expenses of receivers, legal counsel, accountants, managing agents and other persons employed in connection with the Mortgaged Property, and to the payment of Debt Service, Additional Payments, Deposits, Impositions, Insurance Premiums and Transfer Taxes due under this Mortgage; and (x) to do all acts and things necessary, in Mortgagee's sole discretion, to carry out any or all of the foregoing.

47.    The Mortgagee seeks to exercise its rights under its mortgages, by hiring

competent management to collect rents from the Debtor's tenants and use such proceeds to pay

(a) the ordinary and necessary post-petition costs and expenses incurred in the ordinary course of

the operation and maintenance of the Property, (b) the fees required to be paid to the United

States Trustee on a quarterly basis and (c) debt service, to the extent funds are available.

48.    An information sheet on NYC Management is annexed hereto as Exhibit

G.  NYC operates many buildings for prominent clients.  The management fee would be 5%,

substantially less than the Debtor's management fee, and would save the estate the additional

overlay of the Receiver's or a trustee's commission and inevitable professional fees.

49.     If the Court is unprepared to permit the Mortgagee to place competent

management in control of the Property based on its rights under its mortgages, then the Court

should lift the stay to enforce the Receiver Order.

50.     Under the Loan Documents and N.Y. Real Property Law § 254, the

Supreme Court properly entered the Receiver Order, and the Appellate Division properly denied

the Debtor's demand that it vacate that order. *See, e.g., Naar v. LJ. Litwak & Co., Inc.,* 260

A.D.2d 613 (2d Dep't 1999); *Essex v. Newman,* 220 A.D.2d 639 (2d Dep't 1995); *Bank Leumi*

*Trust Co. of New York v. Lightning Park, Inc.*, 149 A.D.2d 692 (1st Dep't 1995); *366 Fourth*

*Street Corp. v. Foxfire Enterprises, Inc.*, 540 N.Y.S.2d 489 (2d Dep't 1989).

51.     A lifting of the stay for "cause" is governed by section 362(d)(1), which

provides, in relevant part, that "[o]n request of a party in interest and after notice and a hearing,

the court shall grant relief from the stay … (1) for cause…"

**52.**     Here, given the limited scope of stay relief sought, the cause exists to

solve the problem created by the Debtor's unfitness to manage its Property and to preclude

further looting of the Debtor's estate while under this Court's jurisdiction.

**53.**     Although grounds exist, the Mortgagee does not support the appointment

of a trustee.  The Debtor has represented that it would have financing in place by now, and the

Court ordered that the Debtor file a Plan by December 8.  The Cash Collateral application is

silent on the Debtor's progress.  If the Debtor fails, the Mortgagee will promptly file a

liquidating plan.  The Mortgagee respectfully suggests that in a simple real estate case, there are

few options for an exit from bankruptcy, and thus, a trustee is unnecessary to bring this case to relatively early close.

## **CONCLUSION**

WHEREFORE, the Mortgagee respectfully requests that the Court enter an order denying the Debtor's application, and that the Court grant such other relief as may be just and proper.

Dated:       New York, New York
             December 3, 2019

                            **BACKENROTH FRANKEL & KRINSKY, LLP**
                            Attorneys for the Mortgagee

                            By:      s/Mark A. Frankel
                                     800 Third Avenue
                                     New York, New York 10022
                                     (212) 593-1100

Exhibit A

Budget; October

| | | |
|---|---|---|
| Insurance | | 2,500.00 |
| Equipment Financing | | 2,715.27 |
| Repairs/Maintenance | | |
|     Pest Control | 500.00 | |
|     Fire Extinguisher | 200.00 | |
|     Sprinkler | 1,000.00 | |
|     Hvac | 1,000.00 | |
|     Elevator | 550.00 | |
|     Equipment | 500.00 | |
|     Cleaning | 3,000.00 | |
| `   Misc. Supplies | 1,500.00 | |
| | | 8,250.00 |
| Utilities | | |
|     Electric | 2,500.00 | |
|     Water & Sewer | 1,000.00 | |
|     Gas | 1,000.00 | |
|     Phone/Internet Services | 2,500.00 | |
| | | 7,000.00 |
| Payroll | | 17,000.00 |
| Office | | 6,000.00 |
| Legal | | 30,000.00 |
| Rental Commissions | | 10,000.00 |
| Owner Salary | | 25,000.00 |
| Capital Improvement/Furniture replacement | | 5,000.00 |
| US Trustee Fee | | 1,000.00 |
| Accountant | | 1,000.00 |
| Taxes | | 6,000.00 |
| (Good faith deposit for future lender to accrue each month) | | 2,000.00 |
| Misc. | | 2,500.00 |
| | | |
| Total Expenses | | 125,965.27 |
| Actual September '19 income | | 126,626.16 |

Budget; November

| | | |
|---|---|---|
| Insurance | | 2,500.00 |
| Equipment Financing | | 2,715.27 |
| Repairs/Maintenance | | |
| Pest Control | 500.00 | |
| Fire Extinguisher | 200.00 | |
| Sprinkler | 1,000.00 | |
| Hvac | 1,000.00 | |
| Elevator | 550.00 | |
| Equipment | 500.00 | |
| Cleaning | 3,000.00 | |
| Misc. Supplies | 1,500.00 | |
| | | 8,250.00 |
| Utilities | | |
| Electric | 2,500.00 | |
| Water & Sewer | 1,000.00 | |
| Gas | 1,000.00 | |
| Phone/Internet Services | 2,500.00 | |
| | | 7,000.00 |
| Payroll | | 17,000.00 |
| Office | | 6,000.00 |
| Legal | | 30,000.00 |
| Rental Commissions | | 10,000.00 |
| Owner Salary | | 25,000.00 |
| Capital Improvement/Furniture replacement | | 5,000.00 |
| US Trustee Fee | | 1,000.00 |
| Accountant | | 1,000.00 |
| Taxes | | 1,000.00 |
| (Good faith deposit for future lender to accrue each month) | | 15,000.00 |
| Misc. | | 2,000.00 |
| Total Expenses | | 133,465.27 |
| November '19 income projected | | 135,000.00 |

Budget; December

| | |
|---|---|
| Insurance | 2,500.00 |
| Equipment Financing | 2,715.27 |

Repairs/Maintenance

| | | |
|---|---|---|
| Pest Control | 500.00 | |
| Fire Extinguisher | 200.00 | |
| Sprinkler | 1,000.00 | |
| Hvac | 1,000.00 | |
| Elevator | 550.00 | |
| Equipment | 500.00 | |
| Cleaning | 3,000.00 | |
| Misc. Supplies | 1,500.00 | |
| | | 8,250.00 |

Utilities

| | | |
|---|---|---|
| Electric | 2,500.00 | |
| Water & Sewer | 1,000.00 | |
| Gas | 1,000.00 | |
| Phone/Internet Services | 2,500.00 | |
| | | 7,000.00 |

| | |
|---|---|
| Payroll | 17,000.00 |
| Office | 6,000.00 |
| Legal | 30,000.00 |
| Rental Commissions | 10,000.00 |
| Owner Salary | 25,000.00 |
| Capital Improvement/Furniture replacement | 5,000.00 |
| US Trustee Fee | 1,000.00 |
| Accountant | 1,000.00 |
| Taxes | 5,000.00 |
| (Good faith deposit for future lender to accrue each month) | 13,000.00 |
| Misc. | 5,000.00 |

| | |
|---|---|
| Total Expenses | 138,465.27 |
| December '19 income projected | 140,000.00 |

Exhibit B

**Mark Frankel**

| | |
|---|---|
| **From:** | Mark Frankel |
| **Sent:** | Thursday, October 10, 2019 1:22 PM |
| **To:** | Wayne Greenwald Esq.  (grimlawyers@aol.com) |
| **Subject:** | 1934 Cash Collateral Budget |

Dear Wayne,

My client has reviewed the Debtor's budget and has the following comments:

1. Insurance:    Please provide copies of declaration pages and invoices for payment including a record of amounts paid and amounts due.

2. Equipment Financing:  Please provide copies of leases and invoices for payment including a record of amounts paid and amounts due.

3. Repairs and maintenance:  The building is new so the amounts seem high.  Please provide copies of contracts and invoices for payment including a record of amounts paid and amounts due.  Also, please identify any insider relationship to Debtor's members and or Debtor's affiliates.

4. Utilities:  The amounts seem high for electric and phone and internet.  Please provide copies of invoices for payment including a record of amounts paid and amounts due.

5. Payroll: $17,000 per month is extraordinary.  Please provide a breakdown with names of employees, job description, compensation rate, and any identify any insider relationship to Debtor's members and or Debtor's affiliates.

6. Office fee:  disallowed

7. Legal fees:  Please identify firms to be retained, services to be performed and compensation rate.  If agreed, payment will be subject to Bankruptcy Court approval.  Also, please identify any insider relationship to Debtor's members and or Debtor's affiliates.

8. Rental Commission:  Please provide brokerage agreement.  Please note that as condition to use of cash collateral, the mortgagee demands right to approve proposed leases. Also, please identify any insider relationship to Debtor's members and or Debtor's affiliates.

9. Insider salaries:  disallowed

10. Capital Improvements and Furniture:  Please provide copies of existing agreements for such items, including invoices for payment and a record of amounts paid and amounts due.  As condition to use of cash collateral, the mortgagee demands right to approve proposed expenditures. Also, please identify any insider relationship to Debtor's members and or Debtor's affiliates.

11. US Trustee Fees:  Allowed.

12. Accounting Fees:  Please identify firm to be retained, services to be performed and compensation rate.  If agreed, payment will be subject to Bankruptcy Court approval.  Also, please identify any insider relationship to Debtor's members and or Debtor's affiliates.

13.  Real Estate Taxes:  Must be escrowed with Mortgagee pending payment.

14.  Good faith deposit to lender:  Disallowed.

15.  Miscellaneous:  2% appears reasonable, but must be itemized on operating reports.

I will be out for the holidays from Saturday until October 23.  If you have emergency expenses that must be paid before an order is entered, please itemize them today or early tomorrow for my client's review and pre-approval to avoid delays during the holidays.

Best Regards,

Mark Frankel
Backenroth Frankel & Krinsky, LLP
800 Third Avenue, Floor 11
New York, New York  10022
(212) 593-1100

Exhibit C

# Mark Frankel

| | |
|---|---|
| **From:** | grimlawyers@aol.com |
| **Sent:** | Sunday, November 3, 2019 12:35 PM |
| **To:** | Mark Frankel |
| **Subject:** | 1934 Bedford - checks needed |
| **Attachments:** | 1934 Roof repair invoice.jpg; 1934 Bernie Glass invoice.pdf |

CONFIDENTIALITY STATEMENT
This message is intended only for the personal and confidential use of the recipient(s) named above. This message may be a privileged and confidential attorney-client communication. If you are not the intended recipient or their agent, you have received this document in error and any review, dissemination, distribution, or copying of this message is prohibited. If you have received this communication in Error, please notify us at 212-983-1922 and delete the original message.

Thank you.

MESSAGE

Mark

The debtor advises it neeeds to cut checks for the followint expemses:

1) Bernie's Glass:      $1,200  Glass door deposit
2) ADA Painting:      $1,200  Roof repair deposit

Invoices evidencing those expenses are annexed.

Pleasae advise if the debtor can issue the checks.

Thanks and regards

wg
From

WAYNE GREENWALD, P.C.
Attorneys
at 475 Park Ave S-26th Floor
New York, New York 10016
212-983-1922
Fax 877-254-1003
E-mail: grimlawyers@aol.com

Exhibit D

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

In re 1934 BEDFORD LLC
    Debtor

Case No. 19-44751
Reporting Period: OCTOBER 2 -31, 2019

Federal Tax I.D. #  47XXXX1414

## CORPORATE MONTHLY OPERATING REPORT

File with the Court and submit a copy to the United States Trustee within 20 days after the end of the month and
submit a copy of the report to any official committee appointed in the case.
*(Reports for Rochester and Buffalo Divisions of Western District of New York are due 15 days after the end of
the month, as are the reports for Southern District of New York.)*

| REQUIRED DOCUMENTS | Form No. | Document Attached | Explanation Attached |
|---|---|---|---|
| Schedule of Cash Receipts and Disbursements | | | |
| Bank Reconciliation (or copies of debtor's bank reconciliations) | | | |
|    Copies of bank statements | | | |
|    Cash disbursements journals | | | |
| Statement of Operations | | | |
| Balance Sheet | | | |
| Status of Post-petition Taxes | | | |
|    Copies of IRS Form 6123 or payment receipt | | | |
|    Copies of tax returns filed during reporting period | | | |
| Summary of Unpaid Post-petition Debts | | | |
|    Listing of Aged Accounts Payable | | | |
| Accounts Receivable Reconciliation and Aging | | | |
| Taxes Reconciliation and Aging | | | |
| Payments to Insiders and Professional | | | |
| Post Petition Status of Secured Notes, Leases Payable | | | |
| Debtor Questionnaire | | | |

I declare under penalty of perjury (28 U.S.C. Section 1746) that this report and the attached documents
are true and correct to the best of my knowledge and belief.

Signature of Debtor                                   Date

Signature of Authorized Individual*                     Date     11/20/2019

Nikol Vonlavrinoff                                   Date

*Authorized individual must be an officer, director or shareholder if debtor is a corporation; a partner if debtor is a
partnership; a manager or member if debtor is a limited liability company.

In re 1934 BEDFORD LLC
         Debtor

Case No.   19-44751
OCTOBER 2 -31, 2019

## SCHEDULE OF CASH RECEIPTS AND DISBURSEMENTS

Amounts reported should be from the debtor's books and not the bank statement. The beginning cash should be the ending cash from the prior month or, if this is the first report, the amount should be the balance on the date the petition was filed. The amounts reported in the "CURRENT MONTH - ACTUAL" column must equal the sum of the four bank account columns. Attach copies of the bank statements and the cash disbursements journal. The total disbursements listed in the disbursements journal must equal the total disbursements reported on this page. A bank reconciliation must be attached for each account. [See MOR-1 (CON'T)]

| ACCOUNT NUMBER (LAST 4) | | | | CURRENT MONTH ACTUAL (TOTAL OF ALL ACCOUNTS) |
|---|---|---|---|---|
| SEE FOOTNOTE (A) BELOW | MANAGEMENT COMPANY ACCOUNT | | | 0 |
| RECEIPTS | | | | |
| RENT RECEIPTS | | 77788 | | 77788 |
| INTEREST | | | | 0 |
| ACCOUNTS RECEIVABLE - POSTPETITION | | | | |
| LOANS AND ADVANCES | | | | 0 |
| TRANSFER (FROM NON DIP ACCTS) | | | | 0 |
| OTHER (ATTACH LIST) | | | | 0 |
| TRANSFERS (FROM DIP ACCTS) | | | | |
| TOTAL RECEIPTS | 0 | 77788 | 0 | 77788 |
| DISBURSEMENTS | | | | |
| PAYROLL | | 6640 | | 6640 |
| MANAGEMENT COMPANY FEE | | 5581 | | 5581 |
| REPAIRS / MAINTENANCE | | 2225 | | 2225 |
| EQUIPMENT FINANCING | | 2715 | | 2715 |
| UTILITIES | | 1930 | | 1930 |
| INSURANCE | | | | 0 |
| ADMINISTRATIVE | | | | 0 |
| SELLING | | | | 0 |
| ACCOUNTS PAYABLE | | | | 0 |
| OWNER DRAW * | | | | 0 |
| TRANSFERS (TO DIP ACCTS) | | | | 0 |
| PROFESSIONAL FEES | | | | 0 |
| U.S. TRUSTEE QUARTERLY FEES | | | | 0 |
| TRANSFER (TO NON DIP ACCTS) | | | | |
| TOTAL DISBURSEMENTS | | 19091 | 0 | 19091 |
| | | | | |
| NET CASH FLOW (RECEIPTS LESS DISBURSEMENTS) | | 58697 | 0 | 58697 |
| CASH – END OF MONTH | | 58697 | 0 | 58697 |

* COMPENSATION TO SOLE PROPRIETORS FOR SERVICES RENDERED TO BANKRUPTCY ESTATE

## THE FOLLOWING SECTION MUST BE COMPLETED

DISBURSEMENTS FOR CALCULATING U.S. TRUSTEE QUARTERLY FEES: (FROM CURRENT MONTH ACTUAL COLUMN)

| | |
|---|---|
| TOTAL DISBURSEMENTS | 19091 |
| TOTAL DISBURSEMENTS FOR CALCULATING U.S. TRUSTEE QUARTERLY FEES | 19091 |

(A) in the ordinary course of business rents are collected by and expenses paid by the management company

With the opening of it's DIP bank account funds will be transferred to the DIP account

In re 1934 BEDFORD LLC    Case No.    19-44751    Case No. 19-44751
Debtor    Reporting Period: OCTOBER 2 -31, 2019

## BANK RECONCILIATIONS

**Continuation Sheet for MOR-1**

A bank reconciliation must be included for each bank account. The debtor's bank reconciliation may be substituted for this page.

(Bank account numbers may be redacted to last four numbers.)

| | MANAGEMENT COMPANY ACCOUNT | | | |
|---|---|---|---|---|
| **BALANCE PER BOOKS** | 58697 | 0 | 0 | |
| | ███████████████████████████████ | | | |
| **BANK BALANCE** | 58697 | 0 | 0 | 0 |
| (+) DEPOSITS IN TRANSIT *(ATTACH LIST)* | | | | |
| (-) OUTSTANDING CHECKS *(ATTACH LIST)* : | | | | |
| OTHER *(ATTACH EXPLANATION)* | | | | |
| **ADJUSTED BANK BALANCE \*** | 58697 | 0 | 0 | 0 |

\*"Adjusted Bank Balance" must equal "Balance per Books"

| DEPOSITS IN TRANSIT | Date | Amount | Date | Amount |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| **CHECKS OUTSTANDING** | Ck. # | Amount | Ck. # | Amount |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

OTHER

| In re 1934 BEDFORD LLC | Case No. | 19-44751 |
|---|---|---|
| **Debtor** | | OCTOBER 2-31, 2019 |

## STATEMENT OF OPERATIONS (Income Statement)

The Statement of Operations is to be prepared on an accrual basis. The accrual basis of accounting recognizes revenue
when it is realized and expenses when they are incurred, regardless of when cash is actually received or paid.

| REVENUES | OCT. 2-31, 2019 | CUMULATIVE -FILING TO DATE |
|---|---|---|
| RENT INCOME | 77788 | 77788 |
| Less: Discounts | 0 | 0 |
| Net Revenue | 77788 | 77788 |
| **COST OF GOODS SOLD** | | |
| Beginning Inventory | | |
| Add: Purchases | | |
| Add: Cost of Labor | | |
| Add: Other Costs *(attach schedule)* | | |
| Less: Ending Inventory | | |
| Cost of Goods Sold | | 0 |
| Gross Profit | 77788 | 77788 |
| **OPERATING EXPENSES** | | |
| Advertising | | 0 |
| Auto and Truck Expense | 0 | 0 |
| Bank and credit card fees | 0 | 0 |
| Contributions | 0 | 0 |
| Employee Benefits Programs | 0 | 0 |
| Officer/Insider Compensation* | 0 | 0 |
| Insurance | 0 | 0 |
| Management Fees | 5581 | 5581 |
| Office Expense | 0 | 0 |
| Administrative and Accounting | 0 | 0 |
| Repairs and Maintenance | 2225 | 2225 |
| Rent and Lease Expense | 0 | 0 |
| Salaries | 6640 | 6640 |
| Supplies | 0 | 0 |
| Taxes - Payroll employer | 0 | 0 |
| Taxes - Real Estate | 0 | 0 |
| Taxes - Other | 0 | 0 |
| Travel and Entertainment | 0 | 0 |
| Utilities | 1930 | 1930 |
| Other *(attach schedule)* | 0 | 0 |
| Total Operating Expenses Before Depreciation | 16376 | 16376 |
| Depreciation/Depletion/Amortization | | |
| **Net Profit (Loss) Before Other Income & Expenses** | 61412 | 61412 |
| **OTHER INCOME AND EXPENSES** | | |
| Other Income *(attach schedule)* | | |
| Interest Expense | | |
| Other Expense: equipment financing | -2715 | -2715 |
| Net Profit (Loss) Before Reorganization Items | 58697 | 58697 |

In re 1934 BEDFORD LLC

**Debtor**

Case No.    19-44751

OCTOBER 2 -31, 2019

| REORGANIZATION ITEMS | | |
|---|---|---|
| Professional Fees | 2850 | 2850 |
| U. S. Trustee Quarterly Fees | 108 | 108 |
| Interest Earned on Accumulated Cash from Chapter 11 *(see continuation sheet)* | | |
| Gain (Loss) from Sale of Equipment | | |
| Other Reorganization Expenses *(attach schedule)* | | |
| Total Reorganization Expenses | 2958 | 2958 |
| Income Taxes | | |
| Net Profit (Loss) | 55739 | 55739 |

*"Insider" is defined in 11 U.S.C. Section 101(31).

## BREAKDOWN OF "OTHER" CATEGORY

OTHER COSTS

| | | |
|---|---|---|
| | | |
| | | |
| | | |
| | | |

OTHER OPERATIONAL EXPENSES

| | | |
|---|---|---|
| | | |
| | | |
| | | |
| | | |

OTHER INCOME

| | | |
|---|---|---|
| | | |
| | | |

OTHER EXPENSES

| | | |
|---|---|---|
| | | |
| | | |

OTHER REORGANIZATION EXPENSES

| | | |
|---|---|---|
| | | |
| | | |
| | | |

**Reorganization Items - Interest Earned on Accumulated Cash from Chapter 11:**

Interest earned on cash accumulated during the chapter 11 case, which would not have been earned but for the bankruptcy proceeding, should be reported as a reorganization item.

In re 1934 BEDFORD LLC

Debtor

Case No. 19-44751

OCTOBER 2 -31, 2019

## BALANCE SHEET

The Balance Sheet is to be completed on an accrual basis only.  Pre-petition liabilities must be classified separately from post-petition obligations.

| ASSETS | BOOK VALUE AT END OF CURRENT REPORTING MONTH | BOOK VALUE AT END OF PRIOR REPORTING MONTH | BOOK VALUE ON PETITION DATE OR SCHEDULED |
|---|---|---|---|
| CURRENT ASSETS | | | |
| Unrestricted Cash and Equivalents | 58697 | | 0 |
| Security Deposits | | | |
| Accounts Receivable (Net) | | | |
| Notes Receivable | | | |
| Inventories | | | |
| Prepaid Expenses | | | |
| Professional Retainers | 20000 | | 20000 |
| Other Current Assets (attach schedule) | | | |
| TOTAL CURRENT ASSETS | 78697 | 0 | 20000 |
| PROPERTY & EQUIPMENT | | | |
| Real Property and Improvements | 38600000 | | 38600000 |
| Machinery and Equipment | 65000 | | 65000 |
| Furniture, Fixtures and Office Equipment | | | |
| Leasehold Improvements | | | |
| Vehicles | | | |
| Less:  Accumulated Depreciation | | | |
| TOTAL PROPERTY & EQUIPMENT | 38665000 | 0 | 38665000 |
| OTHER ASSETS | | | |
| Amounts due from Insiders* | | | |
| Other Assets (attach schedule) Goodwill | | 0 | 0 |
| TOTAL OTHER ASSETS | | 0 | 0 |
| TOTAL ASSETS | 38743697 | 0 | 38685000 |

| LIABILITIES AND OWNER EQUITY | BOOK VALUE AT END OF CURRENT REPORTING MONTH | BOOK VALUE AT END OF PRIOR REPORTING MONTH | BOOK VALUE ON PETITION DATE |
|---|---|---|---|
| LIABILITIES NOT SUBJECT TO COMPROMISE (Postpetition) | | | |
| Accounts Payable | | | |
| Taxes Payable (refer to FORM MOR-4) | | | |
| Wages Payable | | | |
| Notes Payable | | | |
| Rent / Leases - Building/Equipment | | | |
| US Trustee Fees | 108 | | |
| Professional Fees | 2850 | | |
| Amounts Due to Insiders* | | | |
| Other Post-petition Liabilities (attach schedule) | | | |
| TOTAL POST-PETITION LIABILITIES | 2958 | 0 | 0 |
| LIABILITIES SUBJECT TO COMPROMISE (Pre-Petition) | | | |
| Secured Debt : | 20478704 | | 20478704 |
| Priority Debt : Taxes | 0 | | |
| Unsecured Debt | 8641000 | | 8641000 |
| TOTAL PRE-PETITION LIABILITIES | 29119704 | 0 | |
| TOTAL LIABILITIES | 29122662 | 0 | 29119704 |
| OWNERS' EQUITY | | | |
| Capital Stock | | | |
| Additional Paid-In Capital | | | |
| Partners' Capital Account | | | |
| Owner's Equity Account | | | |
| Retained Earnings - Pre-Petition | 9565296 | | 9565296 |
| Retained Earnings - Post-petition | 55739 | | |
| Adjustments to Owner Equity (attach schedule) | | | |
| Post-petition Contributions (attach schedule) | | | |
| NET OWNERS' EQUITY | 9621035 | 0 | 9565296 |
| TOTAL LIABILITIES AND OWNERS' EQUITY | 38743697 | 0 | 38685000 |

*"Insider" is defined in 11 U.S.C. Section 101(31).

In re 1934 BEDFORD LLC

Debtor

Case No.                 19-44751

OCTOBER 2 -31,  2019

**BALANCE SHEET - continuation section**

| ASSETS | BOOK VALUE AT END OF CURRENT REPORTING MONTH | BOOK VALUE AT END OF PRIOR REPORTING MONTH | BOOK VALUE ON PETITION DATE |
|---|---|---|---|
| **Other Current Assets** | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| **Other Assets** | | | |
| | | | |
| | | | |

| LIABILITIES AND OWNER EQUITY | BOOK VALUE AT END OF CURRENT REPORTING MONTH | | BOOK VALUE ON PETITION DATE |
|---|---|---|---|
| **Other Post-petition Liabilities** | | | |
| | | | |
| | | | |
| | | | |
| **Adjustments to Owner's Equity** | | | |
| | | | |
| **Post-Petition Contributions** | | | |
| | | | |

Restricted Cash:  Cash that is restricted for a specific use and not available to fund operations.
Typically, restricted cash is segregated into a separate account, such as an escrow account.

In re 1934 BEDFORD LLC
    Debtor

Case No. 19-44751
Reporting Period: OCTOBER 2 -31, 2019

## STATUS OF POST-PETITION TAXES

The beginning tax liability should be the ending liability from the prior month or, if this is the first report, the
amount should be zero.

Attach photocopies of IRS Form 6123 or payment receipt to verify payment or deposit of federal payroll taxes.

Attach photocopies of any tax returns filed during the reporting period.

| Federal | Beginning Tax | Amount Withheld and/or Accrued | Amount Paid | Date Paid | Check # or EFT | Ending Tax |
|---|---|---|---|---|---|---|
| Withholding | | | | | | |
| FICA-Employee | | | | | | |
| FICA-Employer | | | | | | |
| Unemployment | | | | | | |
| Income | | | | | | |
| Other: | | | | | | |
| Total Federal Taxes | | | | | | |
| State and Local | | | | | | |
| Withholding | | | | | | |
| Sales | | | | | | |
| Excise | | | | | | |
| Unemployment | | | | | | |
| Real Property | | | | | | |
| Personal Property | | | | | | |
| Other: | | | | | | |
| Total State and Local | | | | | | |
| Total Taxes | | | | | | |

## SUMMARY OF UNPAID POST-PETITION DEBTS

Attach aged listing of accounts payable.

| | Current | 0-30 | 31-60 | 61-90 | Over 91 | Total |
|---|---|---|---|---|---|---|
| Accounts Payable | 0 | | | | | 0 |
| Wages Payable | | | | | | 0 |
| Taxes Payable | | | | | | 0 |
| Rent/Leases-Building | | | | | | 0 |
| Rent/Leases-Equipment | | | | | | 0 |
| Secured Debt/Adequate Protection Payments | | | | | | 0 |
| Professional Fees | 850 | | | | | 850 |
| Amounts Due to Insiders | | | | | | 0 |
| UST Fees | 108 | | | | | 108 |
| Other: | | | | | | 0 |
| Total Post-petition Debts | 958 | | | | | 958 |

Explain how and when the Debtor intends to pay any past due post-petition debts.

In re 1934 BEDFORD LLC
Debtor

Case No.    19-44751
OCTOBER 2019

Case No. 19-44751
Reporting Period: OCTOBER 2 -31, 2019

# ACCOUNTS RECEIVABLE RECONCILIATION AND AGING

| Accounts Receivable Reconciliation | Amount |
|---|---|
| Total Accounts Receivable at the beginning of the reporting period | |
| Plus: Amounts billed during the period | |
| Less: Amounts collected during the period | |
| Total Accounts Receivable at the end of the reporting period | |

| Accounts Receivable Aging | 0-30 Days | 31-60 Days | 61-90 Days | 91+ Days | Total |
|---|---|---|---|---|---|
| 0 - 30 days old | | | | | |
| 31 - 60 days old | | | | | |
| 61 - 90 days old | | | | | |
| 91+ days old | | | | | |
| Total Accounts Receivable | | | | | |
| Less: Bad Debts (Amount considered uncollectible) | | | | | |
| Net Accounts Receivable | | | | | |

# TAXES RECONCILIATION AND AGING

| Taxes Payable | 0-30 Days | 31-60 Days | 61-90 Days | 91+ Days | Total |
|---|---|---|---|---|---|
| 0 - 30 days old | | | | | |
| 31 - 60 days old | | | | | |
| 61 - 90 days old | | | | | |
| 91+ days old | | | | | |
| Total Taxes Payable | | | | | |
| Total Accounts Payable | | | | | |

In re 1934 BEDFORD LLC    Case No.
　　　　Debtor

Case No. 19-44751
Reporting Period: OCTOBER 2 -31, 2019

## PAYMENTS TO INSIDERS AND PROFESSIONALS

Of the total disbursements shown on the Cash Receipts and Disbursements Report (MOR-1) list the amount paid to insiders (as defined in
Section 101(31) (A)-(F) of the U.S. Bankruptcy Code) and to professionals.  For payments to insiders, identify the type of compensation paid
(e.g. Salary, Bonus, Commissions, Insurance, Housing Allowance, Travel, Car Allowance, Etc.).  Attach additional sheets if necessary.

| INSIDERS | | | |
|---|---|---|---|
| NAME | TYPE OF PAYMENT | AMOUNT PAID | TOTAL PAID TO DATE |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| TOTAL PAYMENTS TO INSIDERS | | | |

| PROFESSIONALS | | | | | |
|---|---|---|---|---|---|
| NAME | DATE OF COURT ORDER AUTHORIZING PAYMENT | AMOUNT APPROVED | AMOUNT PAID | TOTAL PAID TO DATE | TOTAL INCURRED & UNPAID* |
| WAYNE GREENWALD | | | | | |
| IMSPIEGEL LLC | | | | | 850 |
| | | | | | |
| | | | | | |
| TOTAL PAYMENTS TO PROFESSIONALS | | | | | 850 |

* INCLUDE ALL FEES INCURRED, BOTH APPROVED AND UNAPPROVED

## POST-PETITION STATUS OF SECURED NOTES, LEASES PAYABLE
## AND ADEQUATE PROTECTION PAYMENTS

| NAME OF CREDITOR | SCHEDULED MONTHLY PAYMENT DUE | AMOUNT PAID DURING MONTH | TOTAL UNPAID POST-PETITION |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| TOTAL PAYMENTS | | | |

| In re 1934 BEDFORD LLC | Case No. | 19-44751 |
|---|---|---|
| Debtor | OCTOBER 2 -31, 2019 | |

## DEBTOR QUESTIONNAIRE

| | Must be completed each month. If the answer to any of the questions is "Yes", provide a detailed explanation of each item. Attach additional sheets if necessary. | Yes | No |
|---|---|---|---|
| 1 | Have any assets been sold or transferred outside the normal course of business this reporting period? | | X |
| 2 | Have any funds been disbursed from any account other than a debtor in possession account this reporting period? | X (A) | |
| 3 | Is the Debtor delinquent in the timely filing of any post-petition tax returns? | | X |
| 4 | Are workers compensation, general liability or other necessary insurance coverages expired or cancelled, or has the debtor received notice of expiration or cancellation of such policies? | | X |
| 5 | Is the Debtor delinquent in paying any insurance premium payment? | | X |
| 6 | Have any payments been made on pre-petition liabilities this reporting period? | | X |
| 7 | Are any post petition receivables (accounts, notes or loans) due from related parties? | | X |
| 8 | Are any post petition payroll taxes past due? | | X |
| 9 | Are any post petition State or Federal income taxes past due? | | X |
| 10 | Are any post petition real estate taxes past due? | | X |
| 11 | Are any other post petition taxes past due? | | X |
| 12 | Have any pre-petition taxes been paid during this reporting period? | | X |
| 13 | Are any amounts owed to post petition creditors delinquent? | | X |
| 14 | Are any wage payments past due? | | X |
| 15 | Have any post petition loans been received by the Debtor from any party? | | X |
| 16 | Is the Debtor delinquent in paying any U.S. Trustee fees? | | X |
| 17 | Is the Debtor delinquent with any court ordered payments to attorneys or other professionals? | | X |
| 18 | Have the owners or shareholders received any compensation outside of the normal course of business? | | X |

(A ) in the ordinary course of business rents are collected by and expenses paid by the management company



October 10, 2019

1934 BEDFORD LLC DIP
1310 48TH ST STE 300
BROOKLYN NY 11219

To Whom It May Concern:

    Please accept this letter as verification of the below account information:

    Account Holder Name:  1934 BEDFORD LLC DIP
    Account Holder Address: 1310 48TH ST STE 300, BROOKLYN NY 11219
    Account Number: ███████7855
    ABA/Routing Number : ████████

    Should you have any further questions, please feel free to contact the undersigned
at **(718) 621-7357**

Thank You,

**Zoya Donskaya / Team Leader**
**Senior Client Associate - Officer**
T: (718) 621-7357 | F: (718) 621-7389
T: (718) 621-7306
6321 New Utrecht Avenue. Brooklyn, NY 11219
**zdonskaya@signatureny.com**

Exhibit E

(b)     All Leases shall be made only in accordance with all applicable rent regulations. Mortgagor shall comply with all applicable orders of rent regulatory authorities, and shall promptly refund all rent or other overcharges found to be due with respect to periods on or subsequent to the date of this Mortgage, and if Mortgagor or an affiliate shall have owned the Mortgaged Property prior to the date of this Mortgage, then also with respect to such period prior to the date of this Mortgage during which Mortgagor or an affiliate owned the Mortgaged Property, and pay when due any penalties, fees or damages that may be assessed, with respect to the Premises and the tenants and leases thereof.

(c)     Upon any foreclosure of this Mortgage, Mortgagor shall deliver to Mortgagee all leases, contracts, documents, rent rolls and other records used in the operation of the Premises, together with security deposits held by Mortgagor or as reflected in Leases or by receipts held by tenants, and all accrued interest due thereon. Except to the extent any security deposits have actually been delivered to Mortgagee, Mortgagor agrees to indemnify and save Mortgagee harmless from and against any claim or lien against Mortgagee or the Mortgaged Property for the return of any security deposits and interest under any leases with tenants.

(d)     Mortgagor shall not with respect to any present or future leases accept prepayment of rent prior to its due date in excess of one month.

(e)     Mortgagor shall furnish to Mortgagee, within 30 days after execution thereof, a full copy of each and every residential and commercial lease, lease renewal or lease extension, modification or amendment with respect to the Premises. Mortgagor shall exhibit to Mortgagee original signed counterparts of all leases upon request within ten days.

(f)     Except as required by law, residential leases and renewals thereof shall be for a term not exceeding two years and shall be at the maximum rental permitted by law (or if less, fair market rental). Commercial leases and renewals thereof shall be for a term not to exceed ten years and at a monthly rental of not less than the highest monthly rental of the prior leasing period (or if less, fair market rental). No lease, either residential or commercial, shall contain any right by tenant to renew or extend the same.

21.     **ASSIGNMENT OF LEASES AND RENTS.**

(a)     Mortgagor hereby assigns to Mortgagee all of Mortgagor's right, title and interest as landlord under all existing and future leases and the rents, issues and profits of the Mortgaged Property as further security for the payment of Debt Service, Additional Payments, Deposits and Transfer Taxes, and if Mortgagee exercises its rights pursuant to Paragraph 21(b), as further security for the payment of all charges and expenses of operating the Premises, and all fees, disbursements and expenses of receivers, legal counsel, accountants, managing agents and other persons employed in connection with the Mortgaged Property.

(b)     In furtherance of the assignment provided in Paragraph 21 (a), Mortgagor hereby grants to Mortgagee the following rights and powers: (i) to enter upon and take possession of the Premises; (ii) to demand payment of and collect the rents and other amounts payable under Leases, and to demand and enforce performance of the terms, covenants and conditions of Leases, by legal proceedings or otherwise; (iii) to exercise all of Mortgagor's rights, interests and

Building Loan Mortgage and Assignment of Leases and Rents and Security Agreement
44601007v.1

remedies in and under the Leases; (iv) to settle, adjust or compromise the rents and other amounts payable under the Leases, and to settle, adjust or compromise any legal proceeding brought to collect the rents and other amounts payable thereunder or to obtain performance thereof; (v) to prepare, file and sign Mortgagor's name on any proof of claim in bankruptcy, or similar document in a similar proceeding, against obligors of the Leases; (vi) to endorse the name of Mortgagor upon any payment or proceeds of the rents and other amounts payable under the Leases and to deposit the same to the account of Mortgagee; (vii) to hold, manage, lease and operate the Mortgaged Property as Mortgagee may deem proper; (viii) to make necessary capital expenditures; (ix) to apply such rents, income and profits to the payment of all charges and expenses of operating the Premises, fees, disbursements and expenses of receivers, legal counsel, accountants, managing agents and other persons employed in connection with the Mortgaged Property, and to the payment of Debt Service, Additional Payments, Deposits, Impositions, Insurance Premiums and Transfer Taxes due under this Mortgage; and (x) to do all acts and things necessary, in Mortgagee's sole discretion, to carry out any or all of the foregoing.

(c)      If the Mortgagor or any Person controlled by, controlling or under common control with, Mortgagor is an occupant of the Premises, then upon any default under this Mortgage (after the expiration of any applicable notice and/or cure period), Mortgagor or such Person will pay monthly in advance to the Mortgagee, or to any receiver appointed to collect the rents, issues and profits, the fair and reasonable rental value for the use and occupation of the Premises or of such part thereof as may be in the possession of the Mortgagor or such Person, and upon failure to make any such payment will vacate and surrender the possession of the Premises to the Mortgagee or to the receiver, and upon failure to vacate and surrender possession, may be evicted by summary proceedings.

(d)      Mortgagee hereby waives the right to enter upon and to take possession of the Premises for the purposes above set forth, including the right to take possession of the Premises for the purpose of collecting rents, issues and profits, and Mortgagor shall be entitled to collect and receive rents, issues and profits until the occurrence of any Event of Default under this Mortgage (prior to the expiration of any applicable notice and/or cure period). Mortgagor agrees to use rents, issues and profits in payment of Debt Service, Additional Payments and Deposits, and in payment of Impositions, Insurance Premiums, Transfer Taxes and expenses of operating the Premises, and after payment of all such amounts that are then due, Mortgagor shall be entitled to retain any balance of rents, issues and profits then collected by it. The right of Mortgagor to collect and receive the rents, issues and profits may be revoked by Mortgagee upon the occurrence of any Event of Default upon five days' written notice. The right of revocation by Mortgagee shall become effective whether or not any other required notice has been given or applicable cure period has expired, whether or not foreclosure has been instituted and without applying for a receiver.

(e)      The covenants herein contained on the part of Mortgagor shall be deemed to be covenants running with the land and shall be binding upon Mortgagor and any subsequent owner or owners of the Mortgaged Property or any portions thereof and its or their respective successors and assigns.  This assignment of leases and rents, together with all the covenants herein contained on the part of Mortgagor shall inure to the benefit of Mortgagee and any subsequent holder or holders of this Mortgage and its or their respective successors and assigns.

(f)     Nothing herein contained shall be construed to bind Mortgagee to the performance of any of the covenants, conditions or provisions contained in the Leases, or otherwise to impose any obligation on Mortgagee with respect thereto (including any liability under a covenant of quiet enjoyment contained in any tenant lease or under applicable law if any tenant shall have been joined as a party defendant in any foreclosure action and shall have been foreclosed of all right, title and interest and all equity of redemption in the Mortgaged Property), except that Mortgagee shall be accountable for any money actually received pursuant to this assignment of leases and rents.

(g)     Mortgagor irrevocably authorizes and directs the tenant under any tenant lease, upon demand and notice from Mortgagee of Mortgagor's default under this Mortgage, to pay all rents and other sums due under the respective tenant lease to Mortgagee without liability to the tenant for the determination of the existence of any default claimed by Mortgagee.

22.    **PAYMENTS FROM DEPOSITS; MORTGAGEE'S LIABILITY.**

(a)     Mortgagee shall make all payments of Impositions and Insurance Premiums for which it is holding Deposits by their respective due dates, including grace periods, if and only if each of the following conditions are met: (i) Mortgagor has timely made all Deposits for any purpose that may be required or demanded by Mortgagee under Paragraph 4; (ii) Mortgagor is not overdue (without regard to any applicable notice and/or cure period) in the payment of any Debt Service or Additional Payments due under this Mortgage, and no other Event of Default shall have occurred and remain uncured after any applicable notice and/or cure period; (iii) no amount advanced by Mortgagee to satisfy any obligation of Mortgagor under this Mortgage, including interest thereon computed as provided in this Mortgage, remains unpaid by Mortgagor (whether or not the failure to have paid any such amount does not yet constitute a default because of any applicable notice or cure period or otherwise); and (iv) no action to foreclose this Mortgage or to enforce the Note or any other agreement relating thereto shall be pending.

(b)     Notwithstanding anything in this Mortgage that might otherwise be construed to the contrary, in no event shall Mortgagee at any time be liable to Mortgagor for any damages, costs or expenses in excess of Mortgagee's equity in this Mortgage. All judgments against Mortgagee or any of its principals or agents shall be enforced against said equity and not against any other present or future asset of Mortgagor or any of its principals or agents. If Mortgagee fails to pay any payments of Impositions or Insurance Premiums for which it is holding adequate Deposits, or any other payment for which Mortgagee is or may become responsible with respect to the Mortgaged Property, Mortgagor, as its sole and exclusive remedy, may pay any such payment that Mortgagee has so failed to pay to the Person to whom due and may deduct the amount so paid, including any interest and penalties due thereon, from the next regular installments of Debt Service and/or Deposits, as the case may be, due hereunder.

(c)     Whenever in this Mortgage or as a matter of law it is provided that Mortgagee's consent or approval shall not be unreasonably withheld or the actions of Mortgagee shall be reasonable, the remedy of Mortgagor, if Mortgagor shall claim or establish that Mortgagee has unreasonably withheld its consent or approval or has acted unreasonably, shall be limited to injunctive relief or declaratory judgment, and in no such event shall Mortgagor be entitled to obtain, nor shall Mortgagee be liable for, a money judgment.

31

Exhibit F

(e)    Mortgagor shall furnish to Mortgagee, within 30 days after execution thereof, a full copy of each and every residential and commercial lease, lease renewal or lease extension, modification or amendment with respect to the Premises. Mortgagor shall exhibit to Mortgagee original signed counterparts of all leases upon request within ten days.

(f)    Except as required by law, residential leases and renewals thereof shall be for a term not exceeding two years and shall be at the maximum rental permitted by law (or if less, fair market rental). Commercial leases and renewals thereof shall be for a term not to exceed ten years and at a monthly rental of not less than the highest monthly rental of the prior leasing period (or if less, fair market rental). No lease, either residential or commercial, shall contain any right by tenant to renew or extend the same.

21.    Assignment of Leases and Rents

(a)    Mortgagor hereby assigns to Mortgagee all of Mortgagor's right, title and interest as landlord under all existing and future leases and the rents, issues and profits of the Mortgaged Property as further security for the payment of Debt Service, Additional Payments, Deposits and Transfer Taxes, and if Mortgagee exercises its rights pursuant to Paragraph 21(b), as further security for the payment of all charges and expenses of operating the Premises, and all fees, disbursements and expenses of receivers, legal counsel, accountants, managing agents and other persons employed in connection with the Mortgaged Property.

(b)    In furtherance of the assignment provided in Paragraph 21 (a), Mortgagor hereby grants to Mortgagee the following rights and powers: (i) to enter upon and take possession of the Premises; (ii) to demand payment of and collect the rents and other amounts payable under Leases, and to demand and enforce performance of the terms, covenants and conditions of Leases, by legal proceedings or otherwise; (iii) to exercise all of Mortgagor's rights, interests and remedies in and under the Leases; (iv) to settle, adjust or compromise the rents and other amounts payable under the Leases, and to settle, adjust or compromise any legal proceeding brought to collect the rents and other amounts payable thereunder or to obtain performance thereof; (v) to prepare, file and sign Mortgagor's name on any proof of claim in bankruptcy, or similar document in a similar proceeding, against obligors of the Leases; (vi) to endorse the name of Mortgagor upon any payment or proceeds of the rents and other amounts payable under the Leases and to deposit the same to the account of Mortgagee; (vii) to hold, manage, lease and operate the Mortgaged Property as Mortgagee may deem proper; (viii) to make necessary capital expenditures; (ix) to apply such rents, income and profits to the payment of all charges and expenses of operating the Premises, fees, disbursements and expenses of receivers, legal counsel, accountants, managing agents and other persons employed in connection with the Mortgaged Property, and to the payment of Debt Service, Additional Payments, Deposits, Impositions, Insurance Premiums and Transfer Taxes due under this Mortgage; and (x) to do all acts and things necessary, in Mortgagee's sole discretion, to carry out any or all of the foregoing.

(c)    If the Mortgagor or any Person controlled by, controlling or under common control with, Mortgagor is an occupant of the Premises, then upon any default under this Mortgage (after the expiration of any applicable notice and/or cure period), Mortgagor or such Person will pay monthly in advance to the Mortgagee, or to any receiver appointed to collect the rents, issues and profits, the fair and reasonable rental value for the use and occupation of the

44599281v.1

NYSCEF DOC. NO. 3 RECEIVED NYSCEF: 06/03/2019

Premises or of such part thereof as may be in the possession of the Mortgagor or such Person, and upon failure to make any such payment will vacate and surrender the possession of the Premises to the Mortgagee or to the receiver, and upon failure to vacate and surrender possession, may be evicted by summary proceedings.

(d)     Mortgagee hereby waives the right to enter upon and to take possession of the Premises for the purposes above set forth, including the right to take possession of the Premises for the purpose of collecting rents, issues and profits, and Mortgagor shall be entitled to collect and receive rents, issues and profits until the occurrence of any event of default under this Mortgage (prior to the expiration of any applicable notice and/or cure period). Mortgagor agrees to use rents, issues and profits in payment of Debt Service, Additional Payments and Deposits, and in payment of Impositions, Insurance Premiums, Transfer Taxes and expenses of operating the Premises, and after payment of all such amounts that are then due, Mortgagor shall be entitled to retain any balance of rents, issues and profits then collected by it. The right of Mortgagor to collect and receive the rents, issues and profits may be revoked by Mortgagee upon the occurrence of any event of default upon five days' written notice. The right of revocation by Mortgagee shall become effective whether or not any other required notice has been given or applicable cure period has expired, whether or not foreclosure has been instituted and without applying for a receiver.

(e)     The covenants herein contained on the part of Mortgagor shall be deemed to be covenants running with the land and shall be binding upon Mortgagor and any subsequent owner or owners of the Mortgaged Property or any portions thereof and its or their respective successors and assigns.  This assignment of leases and rents, together with all the covenants herein contained on the part of Mortgagor shall inure to the benefit of Mortgagee and any subsequent holder or holders of this Mortgage and its or their respective successors and assigns.

(f)     Nothing herein contained shall be construed to bind Mortgagee to the performance of any of the covenants, conditions or provisions contained in the Leases, or otherwise to impose any obligation on Mortgagee with respect thereto (including any liability under a covenant of quiet enjoyment contained in any tenant lease or under applicable law if any tenant shall have been joined as a party defendant in any foreclosure action and shall have been foreclosed of all right, title and interest and all equity of redemption in the Mortgaged Property), except that Mortgagee shall be accountable for any money actually received pursuant to this assignment of leases and rents.

(g)     Mortgagor irrevocably authorizes and directs the tenant under any tenant lease, upon demand and notice from Mortgagee of Mortgagor's default under this Mortgage, to pay all rents and other sums due under the respective tenant lease to Mortgagee without liability to the tenant for the determination of the existence of any default claimed by Mortgagee.

22.     <u>Payments From Deposits; Mortgagee's Liability</u>

(a)     Mortgagee shall make all payments of Impositions and Insurance Premiums for which it is holding Deposits by their respective due dates, including grace periods, if and only if each of the following conditions are met: (i) Mortgagor has timely made all Deposits for any purpose that may be required or demanded by Mortgagee under Paragraph 4; (ii) Mortgagor is

44599281v.1

Exhibit G



## Property Management

## OVERVIEW

NYC Management works to earn the respect and loyalty of owners by delivering the highest level of personalized attention and service to all aspects of operating assets, including:

- Billing & Rent Collections
- Budgeting/Asset Management
- New Revenue Evaluations & Implementations
- Operational Efficiences and Process Management
- Zoning & Architectural Studies

- Tenant Relations
- Leasing
- Payroll and Staffing
- Accounting and Legal
- Repairs and Renovations
- Supplier, Contractor and Union Relations

- Violations Monitoring & Removal
- Return on Improvements, J-51 and other Tax Abatements
- Financial Reporting and Accounting
- Construction Management
- Cost Benefit Analyses of Capital Improvements

NYC Management's seasoned professional staff consists of licensed property managers, engineers and attorneys, and is supported by a dedicated team of field managers and administrators with vast experience to provide quantifiable results. The team treats every property as an individual business with an owner's level of care and concern to create or enhance value.

In New York City, extensive knowledge is required of local laws and acute attention to detail in order to properly manage commercial and residential real estate assets. NYC Management uncovers value and creates efficiencies, which ultimately results in the service paying for itself.

Owners are in good hands with NYC Management on duty in their buildings.



| 5





## Property Management

New York City Management has been selected by the Attorney General of the State of New York to manage a portfolio of 107 buildings for a period of 5 years.

Effective July 1, 2018, NYCM has assumed full management control of approx. 2000 apartments and 150 stores. Buildings include a mix of high rent luxury apartments and rent regulated tenants.
NYCM has opened a new fully staffed project office to handle this assignment.



## Property Management

### EXPERTISE

Assets in New York City require extensive knowledge of local laws and acute attention to detail. NYC Management uncovers value and creates efficiencies, which can result in our service paying for itself. NYCM's team can handle all aspects of operating your asset. Our seasoned professional staff consists of licensed property managers, engineers and attorneys, supported by our dedicated team of field managers and administrators. There`s no legwork, research, or coordination necessary, as NYC Management provides a complete range of services.

### PHILOSOPHY

Much to our clients' satisfaction, every building with us is handled with an owner's level of enthusiasm and concern. NYC Management treats each property as an individual business, with the goal of creating or enhancing value to increase the bottom line. We perform cost-benefit analyses as part of a strategic recommendation prior to any capital improvement. NYC Management is highly focused on operational excellence to optimize value.

Always with an eye toward the bottom line, we negotiate the best terms with established suppliers. Our substantial portfolio of client properties provides cost efficiencies gained through volume purchases. We recognize that tenants are your source of income from the property, and thus we provide responsive, courteous service. Effective management is crucial to the enduring value of your investment.

### NYCM Assets Under Management

- 4,000 apartment units
- 600,000 SF of office
- 200 retail stores



| 7



## Property Management Team

*Clients benefit from the convenience of interfacing with one relationship manager who leverages the expertise of our functional asset and field managers.*

**Asset Management**

**7 Professionals**
(Client relations, budgeting, Legal & asset management)

| | | |
|---|---|---|
| **Field Managers** | **Property Managers** | **Accounting, Reporting, & Back Office** |
| 6 Field Managers | 12 Agents + Admin | 9 Professionals |
| (Manage repairs, maintenance, renovations, & building staff) | (Manage properties, leasing, collections, legal, filings & tenant relations) | (Inputting, Reporting & Controls) |



| 8



## HPD Relationship

*In April 2013, NYCM was approved for Qualified Property Manager by Housing Preservation & Development.*

The goal of this qualification is to help maintain long term affordability and ensure the physical viability and responsible management of privately owned properties developed or preserved by HPD. Property managers are deemed qualified by demonstrating existing capacity to manage buildings with significant challenges such as high operating costs and low rental collection rates. When the Division of Asset Management requires a third party property management, it may recommend that the owner  of an at risk portfolio consider Qualified Property Managers (determined by HPD) such as NYCM.



## Foreign Ownership

### 140 West 86th Street, New York, NY



- 15-story plus penthouse elevator building

- Foreign Privately Held Investment Group appointed NYCM to manage a residential building with 44 apartments and 4 office units that has approximately 66,614 square feet

**NYCM Performance:**

- NYCM maintained nearly 100% occupancy and collections. Additionally, NYCM is in the process of boiler gas-conversion to lower operating expenses.

### The Fine Arts Building (232 East 59th Street, New York, NY)



- Foreign Privately Held Investment Group appointed NYCM to manage a 6-story commercial building with 14 high-end designer showrooms that has approximately 42,176 square feet.

**NYCM Performance:**

- NYCM performed an initial building inspection and submitted a proposal for major capital improvements.
- NYCM assisted with the due diligence for the acquisition and created a leasing and capital improvement plan to reposition the asset.

| 10



# REO & Distressed Asset Management

## 172 Nagle Avenue, New York, NY (Inwood): Court Appointed Manager (2009 – Present)



- NYCM appointed by NYS Courts to property manage a mixed-use building with 59 apartments and 11 retail stores going through the foreclosure process.

- NYCM provided lender, Intervest Bank and receiver detailed pro-forma Profit & Loss statement and Cap X budget to better determine course of action.

**NYCM Performance:**



- NYCM notified tenants of new manager and stabilized asset by reducing tenant payment delinquencies and performing needed improvements.

- NYCM is currently being retained by new buyer to stay on as property manager.

## JP Morgan Chase Preferred REO Property Manager (2009-2010)



- NYCM was retained by JP Morgan Chase to manage numerous multi-family, retail and mixed-use Real Estate Owned (REO) and receivership properties.

- The assets managed to date are located throughout the Tri-state area and include Manhattan, Brooklyn, Long Island, Westchester, Bronx, and Queens.

- NYCM provides a physical condition and property assessment report, a detailed cash flow statement and a Cap X budget to guide JPM as to optimal operational,  pricing, and disposition strategy.



# Institutional Management

## Lincoln Stratford Portfolio: Private Equity Fund Acquisition & Management



**An 11-building Bronx/Brooklyn portfolio (655 apartments & 32 retail stores).**

* Bought for $47,100,000 in Jan '06 as co-investment with the Praedium Group, a leading real estate private equity fund.

* NYCM retained as property manager. Assignment includes detailed monthly reporting.

**NYCM  Results (first two years):**
* Renovated 125 low-rent apartments or 19.1% of portfolio in two years.

* Increased gross revenue approximately 12.5% in 1st two years.

* Removed over 1,250 housing (HPD) violations.

* Completed $3.0 million in improvements much of will qualify for tax & MCI benefits.

*The Praedium Group has since retained NYCM in 2008-09 to manage 10 other similar multi-family assets.*

## 10 West 65th Street (Upper West Side): Touro College Housing



* NYCM retained by Touro College as asset manager for its $44,100,000  acquisition of a 6-story mix-use building (student housing and rent regulated multi-family tenants).

**NYCM Experience**
* Renovated 9 apartments making them suitable for dormitory usage.

* Continue to seamlessly handle the delicate situation between current tenants and incoming ownership while upholding the good name of institution.

| 12



## Office Management

### 39-41 West 32nd Street, New York, NY



- Long –term management (1991 – Present) of a 17-story office building

- The asset has 45 office and 3 retail spaces and total approximately 61,145 square feet.

- Most of the office spaces are between 800 – 1,200 sf. and are occupied by lawyers, accountants and other small businesses

| 13

TEAM



## Sanjay Gandhi
*Managing Director*
(646) 472-8725, sgandhi@nycmgmt.com

Sanjay joined NYCM as an Asset Manager in 2003 where he has managed property of various classes including that of multi-family, commercial and mixed-use. His experience also includes management of commercial property in receivership, for which he presently has appointments. His in-depth understanding of DHCR guidelines, Rent Stabilization laws and financial analysis enable him to understand assets from an operations standpoint and to identify ways to increase revenue and value. Sanjay manages client relationships for NYCM and spearheads pre- and post-contract due diligence on acquisition of assets.

Prior to joining NYCM, Sanjay was a Co-Founder of S.H.P.L, a company marketing luxury home & hotel products based in India. Sanjay was responsible for Business Development & Marketing, leading the company's growth from a single employee start-up to a 60-employee firm with three offices across Asia.

Sanjay has served as an Adjunct Professor at New York University since January 2003, where he teaches Entrepreneurship and Marketing.

NEW YORK CITY
MANAGEMENT

| 16

TEAM



## Matthew Mager
*General Counsel*
(646) 472-8735, mmager@nycmgmt.com

Matt Mager joined New York City Management in 2005 and promptly developed a retail leasing team dedicated to a simple premise – to enthusiastically provide quality, relationship-driven retail leasing services to both landlords and tenants in the metropolitan New York area.  Under Matt's leadership, his retail leasing team has successfully handled a variety of assignments – from single stores as small as 300 square feet to new construction with more than 50,000 square feet of retail and office space.

In addition to running his retail leasing team, Matt serves as General Counsel to New York City Management, representing the company in various matters, including leases, asset management, insurance, human resources and compliance.  Prior to joining New York City Management, Matt practiced as an attorney for more than ten years.

Matt is a member of the International Council of Shopping Centers (ICSC).  He graduated from Lehigh University with a B.A. in History.  He also holds a J.D. from Albany Law School of Union University, and is licensed to practice law in the state of New York.

**TEAM**



## Matthew Slonim
*Chief Operating Officer*
(212) 951-8405, mslonim@besenassociates.com

Matthew Slonim joined NYCM in March 2003 and is the Chief Operating Officer, where he is responsible for overseeing the property and asset management activities. Mr. Slonim also provides critical support in managing the firm's largest clients and leasing the strategic growth and business development activities of the firm.

Under his supervision, the NYCM's team of property managers, field managers, and asset and investment analysts provide real estate clients with turnkey real estate operational and asset management services to offer client's sound recommendations to effectively manage and to maximize performance of client's multi-family, retail and commercial properties located in the greater NY Metro area.

Additionally, Mr. Slonim oversees the team that assists due diligence on acquisitions, dispositions, and joint ventures as well as property management transitions and integrations. During his career, Mr. Slonim has advised clients on pricing, structuring, negotiations, and underwriting of over $500 million in acquisitions, financings, joint ventures and new business with a wide range of private equity, foreign, non-profit and other private real estate investors. Mr. Slonim places an emphasis on operational processes to track operating performance and detailed financial reporting as well as quantitative analysis in advance of capital improvement programs to offer clients clear cash flow visibility and an insightful understanding of NYCM's capital and asset management recommendations.

Early on in his career, Mr. Slonim spent three years as a Research Analyst at National Economic Research Associates, a division of Mercer Consulting focusing on asset and equity valuation in the Securities Litigation Group. He later spent two years working as an Associate at SG Cowen, in their Investment Banking Division executing over $700 million in IPOs and private placements. Prior to working at SG Cowen, Mr. Slonim was in the Corporate Banking Division of The Bank of New York.

Mr. Slonim received his BA in Economics from Washington University, and received his MBA from The Leonard N. Stern School of Business at New York University. Mr. Slonim is a New York State court approved receiver and property manager.