UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------x
In re                                               Chapter 11

    1934 Bedford, LLC,                         Case no.  19-44751

                      Debtors.
---------------------------------------------------------x

## OBJECTION TO DEBTOR'S AMENDED DISCLOSURE STATEMENT

    1930 Bedford Avenue LLC ("Mortgagee"), the holder of the first mortgage (the "First Mortgage") on the property owned by 1934 Bedford, LLC (the "Debtor") at 1930-1934 Bedford Avenue, Brooklyn, New York 10010 (the "Property"), as and for its objection to the Debtor's amended disclosure statement ("Amended Disclosure Statement"), respectfully states as follows:

(a) **Since payment in full under the Debtor's Amended Plan still remains speculative, the Plan still violates sections 1123(a)(1), (2), (3), and (7) and section 1124 of the Code because it misclassifies the Mortgagee as an unimpaired non-voting class,**

(b) **Since the Amended Disclosure Statement does not identify how the Debtor intends to sell the Property, the Amended Disclosure Statement still makes Amended Plan feasibility guesswork,**

(c) **The Disclosure Statement still lacks adequate information on the feasibility of the sale terms, Property income and expenses and insider claims,**

(d) **The Amended Plan may still be a Trojan horse proffered for the improper purpose of delaying a sale of the Property indefinitely, and**

(e) **The Amended Disclosure Statement should not be approved because, like its predecessor, it describes a plan that cannot be confirmed.**

## BACKGROUND

1. On August 2, 2019, the Debtor filed a Chapter 11 petition under Title 11 of the United States Code, 11 U.S.C. "101 et seq. (the "Bankruptcy Code").

2. The Debtor owns the real property at 1930-1934 Bedford Avenue, Brooklyn, New York (the "Property").

3. According to an appraisal the Debtor produced, the Property value is $38,600,000. That appraisal is based on projected yearly net operating income substantially higher than the actual net operating income. That situation is unlikely to change since the Debtor's projections show continued lower net operating income.

4. The Mortgagee holds first mortgages in the principal amount of $15,000,000. As set forth in Mortgagee's September 19, 2019 proof of claim, the total amount due as of September 12, 2019 is $18,809,274. Per diem 24% interest accrues at $10,000 per day. The Debtor's schedules disclose additional secured claims of record against the Property totaling about $1,666,429. Scheduled secured claims thus total approximately $20,478,703. The Debtor's schedules disclose unsecured claims totaling $8,641,000, $8,500,000 is claimed by Nikol Vonlavrinoff, the Debtor's principal. Based on the Schedules, the Claims in this case total about $29,119,703.

5. Besides the Property, the only other assets identified as having value are $24,655 of cash on hand on the petition date and machinery and equipment valued at $65,000.

6.  The $1,686,812 secured lien filed against the Property on about August 29, 2018 was a material event of default under the Mortgages. The Maturity Date in each note ("Notes") annexed to the Proof of Claim is February 28, 2019.

7.  The Mortgagee commenced its Foreclosure Action on June 3, 2019 and promptly sought the appointment of a receiver.

8.  By order dated June 11, 2019 (the "Receiver Order,"), the Supreme Court appointed a receiver to take possession of the Property and the rental income.

9.  On June 23, 2019, the Debtor requested an emergency order to show cause for injunctive relief vacating the Receiver Order pending determination of the Debtor's motion to vacate.

10. The Supreme Court denied the application for injunctive relief and set the matter down for a hearing on the merits. The Debtor appealed both the Receiver Order and the denial of injunctive relief. On June 27, 2019, the Appellate Division affirmed the Receiver Order. On July 10, 2019, the Supreme Court denied the Debtor's order to show cause on the merits.

11. Meanwhile, on June 17, 2019 the Debtor sued the Mortgagee in a special proceeding under RPL § 274-to compel the Mortgagee to retract is prior payoff letter and replace it with a payoff letter that did not include default interest and other charges. The Debtor falsely argued that it had received oral default waivers, despite the loan documents prohibition on oral waivers to preclude such self-serving arguments. The Debtor falsely argued further that the

Mortgagee failed to give default notices, despite there being no obligation in the loan documents to give notice of unauthorized subordinate liens.

13. On August 2, 2019, the receiver filed his bond. The same day, certain petitioners filed this bankruptcy as an involuntary case.

13. According to the Schedules, after the Debtor stopped paying the Mortgagee, Mr. Vonlavrinoff transferred $313,024 to himself, $88,024 allegedly for "Loan Repayment," and $225,000 for "Salary."

14. At a hearing on September 12, 2019 on the Mortgagee's motion to permit the receiver to take possession, it became clear that the involuntary filing was collusive so the Debtor could avoid filing a voluntary petition. The Debtor then consented to an order for relief and stated that it would try to reach a consensual agreement with the Mortgagee to use cash collateral to avoid the installation of the receiver.

15. The last regular mortgage payment was in January 2019. Since then, the Debtor has been collecting rent, but as of October 1, 2019, the Debtor had no money in the bank. Meanwhile interest is accruing a $300,000 per month. The Debtor started paying debt service on January 1, 2020, at the pre-maturity contract rate. Post-maturity interest continues to accrue on the difference between the pre-maturity rate and the 24% post-maturity rate.

16. Since the involuntary petition was commenced, therefore, the Mortgagee's claim has increased by hundreds of thousands of dollars.


17. The Debtor filed a plan (the "First Plan") on December 18, 2019. The Debtor's Plan provided for a refinancing by the confirmation hearing, which was likely to be in late February or early March. The First Plan, however, did not include sale procedures. Instead, if refinancing did not materialize by March, the Debtor proposed to make a motion for sale procedures approval.

18. The Debtor has now decided to sell property but the Amended Plan still does not include sale procedures.

19. With interest accruing at an alarming rate, plus the Mortgagee's fees and expenses and the unliquidated accrued interest and fees of other Secured Creditors the Debtor's equity cushion is eroding quickly and may not be able to survive the long term sale process the First Plan and the Amended Plan contemplate. There are also about $141,000 of non-insider general unsecured claims, plus an estimated $100,000 of administrative claims and other amounts that may arise for a total of about $25,000,000 due on the Effective Date.

20. The Debtor's Amended Plan is an improvement over the First Plan because there is now a potential stalking horse contract at $27,250,000 subject to adjustments and creditors (the "Sale Contract"). The existence of the Sale Contract improves the prospects for creditor payment in this case.

21. But the First Plan's structural problems remain in the Amended Plan. For example, the Amended Plan (a) still has a three-month post-confirmation closing date (NOT time of the essence) and (b) still has no sale procedures. That means that at best it will probably still

take at least six months to get to a closing. And until the closing, it is impossible to know whether the Debtor will satisfy the closing conditions, and whether the sale will ultimately close.

22. Moreover, if the Debtor's contract ofسale under the Debtor's Amended Plan cannot close, either because the Debtor cannot satisfy the conditions to closing or because the buyer reneges, there is no way to know whether the offer made by the backup bidder at the Debtor's (undescribed) auction sale will be high enough to leave the Mortgagee and other creditors unimpaired.

23. The Debtor's proffer that all creditors are unimpaired is speculative at best.

24. Recognizing the risk that sale contracts don't always close as intended, the Mortgagee's Plan accelerates the plan process and solves feasibility issues the Debtor has not addressed in its Amended Disclosure Statement by (a) carving out money from the Mortgagee's first lien on the sale proceeds to pay the Debtor's bankruptcy professional fees, and priority claims, if any, and (b) carving out an additional $25,000 for general unsecured creditors. This represents a 15% distribution if the sale proceeds cover all Secured Claims and a 100% distribution if the insider $8,500,000 claim is expunged. The Mortgagee will also agree to be a stalking horse bidder, with no stalking horse fee, to ensure a sale without conditions (such as the need for the commercial tenant to execute a good guy guarantee).

25. The Mortgagee's Plan also solves a problem that has infected all aspects of this case since its inception. The Debtor is determined to maintain control and ownership over the Property and has crossed the line more than once to achieve that goal. For example, this case

was commenced by a collusive involuntary petition. Despite consenting to Chapter 11 relief, directions from the bench at hearings, and a written order, the Debtor has concealed the Property's income and expenses, failed to pay interest to the Mortgagee, used cash collateral illegally, and filed a pleading with photos and mocking profiles of the religious practices of the Mortgagee's principals and members of their families. The Debtor has continued to ignore its obligation to produce the Property books and records. There is no reason to believe such conduct will abate if the Debtor decides to obstruct the sale contract. If past is prologue, the Debtor will do whatever it can to abort or obstruct the Property sale under the Debtor's Plan.

## **OBJECTION**

**(a) The plan violates sections 1123(a)(1)(2) and (3) and section 1124 of the Code because it misclassifies the Mortgagee Claim as a Class 3 unimpaired non-voting class even though payment in full under the Plan is uncertain – payment is contingent upon the Debtor either refinancing or finding a buyer at a large enough purchase price**

26.  A class of creditors is "impaired," for Chapter 11 plan confirmation purposes, unless the plan leaves unaltered the legal, equitable, and contractual rights of each class member. *Beal Bank, S.S.B. v. Waters Edge Ltd. Partnership*, 248 B.R. 668 (D. Mass. 2000). To be unimpaired, a creditor must be paid in full in cash on the effective date of the plan. Any alteration of that right constitutes an "impairment." *In re Atlantic Terrace Apartment Corp.*, 226 B.R. 535 (Bankr. E.D.N.Y. 1998).

27.  Here the Mortgagee is "impaired" because the Debtor's proposed sale contract is subject to contingencies so it may be aborted, and it is impossible to predict whether

the Debtor's auction sale will yield sale proceeds sufficient to cover the Mortgagee's claim in full in cash.  As with the Debtor's First Plan, substituting either the net sale proceeds (or the property in the case of credit bid), for payment in full of a secured lender's claim is an "impairment."  *In re Atlantic Terrace Apartment Corp.*, 226 B.R. 535 (Bankr. E.D.N.Y. 1998).

28. Since the Mortgagee is impaired, but is denied the right to vote on the Debtor's Amended Plan, the Amended Plan cannot be confirmed under section 1129(a)(1).

**(b)** **The Disclosure Statement does not identify how the Debtor intends to sell the Property, and therefore Plan feasibility remains guesswork.**

29. As with the First Plan, Neither the Debtor's Amended Plan nor the Amended Disclosure Statement specify the sale procedures for the sale of the Property.  To make an informed judgment whether to support the Amended Plan, the Mortgagee is entitled to know the nature and extent of marketing and who will be doing it.

30. Moreover, absent the immediate commencement of marketing, a sale is not likely to occur for at least six months after the accrual of millions of dollars of additional interest.

31. Like the Frist Plan, the facts supporting plan feasibility are too speculative to support plan confirmation.

32. The Amended Disclosure Statement is defective and approval must be denied since the means for implementation of the Amended Plan are inadequate to justify a feasibility finding.

### (c) The Disclosure Statement lacks adequate information on sale terms, Property income and expenses and insider claims,

33.  "Adequate Information" is defined in Section 1125(a)(1) as:

Information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, including a discussion of the potential material Federal tax consequences of the plan to the debtor, any successor to the debtor, and a hypothetical investor typical of the holders of claims or interests in the case, that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan, but adequate information need not include such information about any other possible or proposed plan.

34.  Determining what constitutes adequate information is subjective, and within the discretion of the bankruptcy court. *See Ionosphere Clubs Inc*., 179 B.R. 24, 29 (S.D.N.Y. 1995).

35.  As with First Disclosure Statement, the Amended Disclosure Statement fails to disclose sale procedures. The Amended Disclosure Statement similarly fails to disclose such basic information as the rent roll, the Property's historic income and Property's historic expenses to evaluate the Debtor's sale prospects.

36.  The $8,500,000 insider claim asserted by Mr. Vonlavrinoff remains a mystery.

37.  Rather than make typical disclosures that enable creditors to analyze a plan, the Debtor's pattern of concealment, nondisclosure and misdirection continues in the Amended Disclosure Statement.

### (d) The Amended Plan may be an amended Trojan horse proffered for the improper purpose of delaying a sale of the Property indefinitely

38. Section 1129(a)(3) of the Bankruptcy Code provides that the Court shall confirm a plan only if "the Plan has been proposed in good faith and not by any means forbidden by law." 11 U.S.C. §1129(a)(3).

39. Although the term "good faith" as used in §1129(a)(3) is not defined in the Bankruptcy Code, the term is generally interpreted to mean that there exists a reasonable likelihood that the plan will achieve a result consistent with the objectives and purposes of the Bankruptcy Code. Thus, to determine good faith under Section 1129(a)(3), the important point of inquiry is the plan itself and whether such plan will fairly achieve consistent with the objectives and purposes of the Bankruptcy Code. *In re Madison Hotel Associates*, 749 F.2d 410, 425 (7th Cir. 1984). The Plan "must be 'viewed in light of the totality of the circumstances surrounding the confection' of the Plan" and the bankruptcy judge is in the best position to assess the good faith of the parties' proposals. *Id*.

40. Again, the Plan delays a sale of the Property and hence the effective date, for at least six months, putting payment to creditors at risk. The market may decline while claims against the estate grow.

41. More important, as with the First Plan, if the purchaser under the Sale Contract reneges or if the Debtor cannot satisfy the conditions to closing, the backup bid may be too little to pay claims under the Plan. The plan will fail to go effective and the Debtor will

achieve the goal of is principal to maintain ownership and control without cost and without accountability.

42.    The Amended Plan, therefore, like the First Plan, is not proposed in good faith. It is instead the culmination of the Debtor's delay strategy. the Debtor has acted in bad faith since the collusive involuntary filing, then by concealing the Debtor's books and records, by using cash collateral illegally, by strategically misrepresenting its intentions through omission, and by mocking the religious beliefs of the Mortgagee's principals and their family members. Viewing the totality of the circumstances and because the sale proposed by the Debtors may jeopardize payment in full as represented, the Plan cannot be deemed to have been proposed in "good faith," as required by the Bankruptcy Code, and therefore, is unconfirmable.

**(e) The Disclosure Statement describes a plan that cannot be confirmed**

43.    A disclosure statement should not be approved where it describes a plan of reorganization that cannot be confirmed. *In re 266 WashingtonAssociates,* 141 B.R. 275, 288 (Bankr. E.D.N.Y. 1992) *aff'd*, 147 B.R. 827 (E.D.N.Y. 1992) (disapproval of disclosure statement where it "describes a plan which is fatally flawed and thus incapable of confirmation"); *accord, In re Cardinal Congregate I*, 121 B.R. 760, 764 (Bankr. S.D. Ohio 1990); *see also Curtis Center Limited Partnership,* 195 B.R. 631, 638 (Bankr. E.D. Pa. 1996); *In re Felicity Associates, Inc.,*197 B.R. 12, 14 (Bankr. D.R.I. 1996).

44.    Here, as with the First Plan, the Amended Plan misclassifies the Mortgagee and all junior classes and lacks sale procedures to implement the Plan. Against the

background of the Debtor's misconduct and deception since this case was filed, the risk is high that the Amended Plan is a bad faith exercise in delay.

45.     As shown by the Mortgagee's Plan, this case may be concluded efficiently, successfully and with transparency through the sale process under the Mortgagee's direction that both facilitates the arms-length sale the Debtor seeks, and ensures prompt payment of administrative expenses and priority claims regardless of the outcome.

## **CONCLUSION**

WHEREFORE, the Mortgagee respectfully requests that this Court deny Amended Disclosure Statement approval, and grant such other and further relief as this Court deems just and proper.

Dated: New York, New York
       March 11, 2019

                                        **BACKENROTH FRANKEL & KRINSKY, LLP**
                                        Attorneys for the Mortgagee

                                        By:     s/Mark A. Frankel
                                                    800 Third Avenue
                                                    New York, New York 10022
                                                    (212) 593-1100